## BOWERS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. September 4, 1917. Rehearing
Denied October 8, 1917.)

No. 2571.

1. POST OFFICE ⬅➡49—ACTIONS—EVIDENCE—JURY QUESTION.
    In a prosecution for violating Pen. Code, § 215 (Act March 4, 1909,
    321, 35 Stat. 1130 [Comp. St. 1916, § 10385]), by using the mails in con-
    nection with a scheme to defraud, where it was contended that defend-
    ant, making misrepresentations as to his ownership of Mexican lands and
    their character, disposed of such lands when he did not have title, evi-
    dence *held* to sustain a conviction.
2. POST OFFICE ⬅➡49—OFFENSES—ESSENTIALS.
    The government, in order to convict, must establish that defendant en-
    tered into the scheme charged, that he intended to defraud, and that for
    the purpose of executing his scheme he used the mails.
3. CRIMINAL LAW ⬅➡155—USING MAILS TO DEFRAUD—LIMITATION.
    The essence of the offense denounced by Pen. Code, § 215, being the use
    of the mails in pursuance of such scheme, a prosecution thereunder is
    not barred by limitations because the scheme was devised more than
    three years prior to the filing of the indictment, where overt acts were
    committed within that time.
4. POST OFFICE ⬅➡48(4)—OFFENSES—INDICTMENT.
    A count in an indictment indorsed as an indictment for violation of
    Pen. Code, § 215, which elaborately charged a fraudulent scheme, and
    that defendant in pursuance thereof fraudulently and feloniously placed
    and caused to be placed in the mails a letter, duly set forth, is sufficiently
    definite to show that it charged an offense under such section.
5. POST OFFICE ⬅➡49—OFFENSES—EVIDENCE.
    Testimony as to events relating to the scheme, but occurring more than
    three years before the filing of the indictment, is admissible where within
    that period the mails had been used in furtherance of the scheme.
6. CRIMINAL LAW ⬅➡491(2)—EVIDENCE—HANDWRITING—ADMISSIBILITY.
    Under Act Cong. Feb. 26, 1913, c. 79, 37 Stat. 683 (Comp. St. 1916, §
    1471), declaring that, where the genuineness of the handwriting of a
    person is involved, any admitted or approved handwriting of such person
    shall be competent evidence as a basis for comparison by competent wit-
    nesses, or by the jury, court, or officer conducting such proceeding, to
    prove or disprove such genuineness, it was proper, in a prosecution for
    using the mails in connection with a scheme to defraud, to prove the
    signature of defendant, to admit documents as to which the witnesses
    testified they had seen defendant append his signature.
7. POST OFFICE ⬅➡49—OFFENSES—ADMISSIBILITY.
    Where defendant, having devised a scheme to defraud, intentionally.
    and for the purpose of carrying it out, wrote a letter and mailed it in
    violation of Pen. Code, § 215, within three years prior to the filing of the
    indictment, it was not necessary, in order for such letter to be ad-
    missible, that it should show on its face that it was in furtherance of
    the scheme to defraud.
8. CRIMINAL LAW ⬅➡931—TRIAL—MISCONDUCT OF JUROR.
    Where defendant contended that a juror, during the course of the
    trial and after adjournment, asked whether defendant would take the
    stand, and based upon such occurrence a claim of bias and unfairness on
    the part of the jury, defendant is not, having failed to call the matter to
    the attention of the court before verdict, in a position to thereafter call
    the matter to the court's attention.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
    244 F.—41

9. CRIMINAL LAW ☞1160—APPEAL—REVIEW.

Where there were conflicting affidavits relating to defendant's claim of unfairness on the part of the jury,' the matter cannot be reviewed on error, having been decided adversely as to defendant by the trial court.

10. POST OFFICE ☞50—OFFENSES—INSTRUCTIONS—"OWNED."

In a prosecution for using the mails in connection with a scheme to defraud in the disposition of Mexican lands, which it was claimed defendant did not own though he claimed to have a contract for the purchase of such lands, etc., a charge that the word "owned" implied that defendant had such an interest in and dominion over the property that he could convey a good and sufficient title thereto to an intending purchaser, when taken in connection with instructions that if the representations alleged to have been made in the indictment were false but defendant believed them to be true, they were not fraudulent, is sufficient.

In Error to the District Court of the United States for the Southern Division of the Southern District of California.

Clarence P. Bowers was convicted of violating Pen. Code 1910, § 215, by using the mails in connection with a scheme to defraud, and he brings error. Affirmed.

In an indictment containing three counts, Clarence P. Bowers and others were charged with a violation of section 215 of the Penal Code of 1910. Bowers was convicted under the second count, and asks review under writ of error. The indictment was filed January 10, 1913.

Stated in a brief way, the scheme charged to have been formed before February, 1910, was that the persons intended to be defrauded should be communicated with by mail by Bowers and the others through the medium of a pretended corporation, the C. P. Bowers & Co., and certain letters, papers, and advertising matter containing false and fraudulent representations, and statements concerning the corporation and its business, were to be sent to them by use of the mails. Bowers pretended to be the president, and other defendants were to be represented as the other officers of the corporation, but it is alleged that, in fact, the pretended corporation was not organized under the law of any state or of the United States, but C. P. Bowers & Co. was the name of a fraudulent corporation, and the guise under which Bowers and his associate defendants carried on the scheme. Bowers and the others were to advertise to persons to be defrauded that C. P. Bowers & Co. owned 630 acres of land near Tampico, Mexico, and had "a perfect warranty deed" to said land, and that the title thereto was "free from any possible defects"; that part of the land was cleared and planted; that machinery had been bought to cultivate part of the land to bananas; that banana trees had been planted; that bananas would be planted also for the use of the corporation, and that 300 acres were to be sold to persons intended to be defrauded, for $200 per acre in cash or in installments; that, immediately upon payment of the full purchase price of each acre, the C. P. Bowers & Co. would give the purchaser immediate possession and title, and would cultivate the land and plant banana trees, and that the purchaser would have certain quantities of bananas for each acre of ground; that the corporation would sell the bananas and, after deducting specific sums for services in marketing and for reimbursement, the balance of the sale price would be sent to the purchaser of the land; that the purchasers could pay a first installment of 12½ per cent. of the purchase price at the rate of $200 per acre, and take 30 days within which to investigate the land, and if at the end of 30 days the purchaser did not wish to take the land the C. P. Bowers & Co. would return the purchase money. It is alleged that all these representations and publications were fraudulent, and part of the scheme to defraud, and were to induce persons, in reliance upon the advertisements and publications, to buy portions of the land pretended to be owned by C. P. Bowers & Co., and to pay Bowers and his associates and to the pretended corporation large sums of money,

which sums Bowers and other defendants would wrongfully convert to their own use. It is alleged that when the scheme was devised Bowers knew that it was all fraudulent, and that C. P. Bowers & Co. did not own the land described, and did not have a perfect or warranty deed to the 630 acres of land, and did not have any title to the land which was free from any possible defects, or any title; that Bowers and the other defendants never had title by perfect warranty deed or otherwise to 630 acres of land described, in Mexico or anywhere else in Mexico, in excess of 50 acres; that none of the land was cleared or planted; that no machinery for cultivation had been bought; that there had not been the number of banana shoots planted that were said to have been; that the defendants did not intend to clear and cultivate any land, or to give the purchaser the possession or title contemplated by the advertisements, and did not intend to pay any money over to the purchaser of the land, or to refund any installments to purchasers not desiring to take the land; that the land was not worth $200 per acre, or any other sum in excess of $10 per acre. It is charged that, in order to carry out the scheme as devised, they fraudulently mailed a letter dated February 19, 1910, to T. E. Hughston, at Pomona, Cal., in which Bowers wrote to him that he found it impossible to tell him exactly when he would have a deed for the seven acres of land which Hughston had bought.

Newton J. Skinner, Carl N. Skinner, Earl Rogers, and C. E. Williams, all of Los Angeles, Cal., for plaintiff in error.

Albert Schoonover, U. S. Atty., and J. Robert O'Connor and Clyde R. Moody, Asst. U. S. Attys., all of Los Angeles, Cal.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge (after stating the facts as above). [1, 2] Counsel for defendant has earnestly contended that the evidence was insufficient to sustain a verdict. One of the witnesses for the government testified to this effect: That he was a farmer and mechanic, and about 1909 he bought seven acres of this banana land from C. P. Bowers & Co.; that his transaction was with C. P. Bowers, to whom he paid $1,000 on the purchase; that there was $400 still due, and he sent an agent to Bowers to endeavor to buy only five acres, but failed to adjust the matter as desired, and thereafter paid the $400 still due to Bowers; that he dealt principally with Gillespie, an agent of Bowers; that he received certain circulars through the mail before he made the purchase and a contract, and that he discussed the contract with Bowers, to whom he paid the money in June or July, 1909. The contract is a receipt of a deposit to secure the described quantity of land in the "C. P. Bowers & Co. Banana Plantation," etc., subject to certain conditions. It is recited that, payment having been made, the property will be granted "by good and sufficient deed of conveyance, the above-named lessee grantor furnishing unlimited certificate of title showing title to said property free and clear of incumbrance, within 10 days from date." The contract is signed "C. P. Bowers, Pres." To the contract was attached a "rider," wherein C. P. Bowers & Co. agree to plant the acreage described, within a month from date of the contract, to banana shoots, not less than 200 to the acre, and irrigate, maintain, and market the first year's crop without additional expense other than payment in full of the purchase price, and to continue marketing

the crop at special rates. We quote from the testimony of the witness:

"Well, I paid him $400, and he acknowledged receipt of it, and then I says, 'This circular says that as soon as I make the last payment on it you will hand me the deed. I would like to have the deed.' 'Well,' he says, 'I can't do it just now.' 'Well,' I says, 'Why?' 'Well,' he says, 'it takes some time to get a deed made in Mexico.' 'Well,' I says, 'why did you print it in your circulars?' and he says, 'Oh, you ought to understand anything in a circular ain't law and you don't have to go by it. We have to go by things that we can.' 'Well,' I says, 'how long before you can get it?' 'Well,' he says, 'I don't know, it might take two or three months.' I says, 'I am going away; I have done made my arrangements to go back to Georgia, and I would like to know about the matter.' "

This witness further said that Bowers told him that Gillespie was his agent. On July 16, 1909, Bowers wrote to Hughston that he was entitled to 7 acres in the banana plantation, and said:

"Your deed for the same will be ordered up with the next allotment of these documents, and presented to you for your signature just as soon as practical."

On December 17, 1909, Bowers wrote Hughston that he hoped to have the deed for the 7 acres soon, but he doubted whether he could give to Hughston a "river frontage as originally planned," unless he took up 10 acres, and would like to know if Hughston desired the additional 3 acres. On December 27, 1909, he wrote to Hughston that the deed for the 7 acres would be issued and forwarded for his signature "just as soon as practical," and added that it sometimes took as long as 9 or 10 months to have the documents issued, recorded, etc., in that country. On February 19, 1910, Bowers wrote him that it was impossible for him to tell him exactly when he would have the deed for the 7 acres, that he was hurrying things, "and rest assured that I will have it in your hands at the earliest possible moment." Mr. Hughston testified that he never received any deed, but about April, 1914, a month before the trial of the defendant was begun, he received a letter and deed for 7 acres and turned the papers over to the district attorney. Witness said the deed did not cover the land he bought, nor did it obligate Bowers to cultivate as required by the original contract made. On cross-examination he testified that there was a mistake about his having made a contract to buy 10 acres; that Gillespie put him down for 10 acres, but that he didn't want that much, and after a little squabble he adjusted the matter with Bowers by agreeing to take 7; that he called on Bowers about the delivery in the matter of the deed, and Bowers told him that he was having trouble about getting the deed from Mexico; that he never accepted the deed sent to him in April preceding the trial; that Gillespie told him C. P. Bowers & Co. was a joint-stock company. One of the circulars which the witness said he read set forth in elaborate terms that C. P. Bowers & Co. owned 630 acres in "Tropical Mexico," and would sell 10 acres on an easy installment plan, cultivate it, market the product, and remit the profit, less only a fair discount for acting as sales agents. The land was described as rich and as suitable for banana crops, which would mature rapidly, and bring in at least $41.62 the first year and

$117 the second year. With great detail the quantity of bananas and the prices to be realized were stated in the circular and the contemplated purchaser was advised as follows:

"In the second year you see, you have 1,000 trees, and the proportionate return will be the same, excepting that it will be less the following charge, which is for the services of C. P. Bowers & Co. and is itemized as follows:

"For marketing the fruit, 4¢ per bunch.

"For cultivating your ground, 10% of cash received."

The circular announced that C. P. Bowers & Co. were simply the agents of the purchaser and the contract could be terminated at any time upon the purchaser's desire. The information with respect to titles was as follows:

"Titles.

"The title to the land owned by C. P. Bowers & Co. is a perfect warranty deed, and is free, therefore, from any possible defect.

"Terms.

"We sell the land at $200 per acre. Ten acres sold for $200. You can pay the money down and secure immediate possession of title, or pay for each acre of land you take on the installment plan, i. e., $25 down and $15 monthly till paid. Deed to your land is handed you the moment the last payment has been made. When you receive your deed you have a complete acre or more (if you have bought more) of land under full cultivation, we, as your agents, having brought it to that stage. Thereafter you receive your annual income as its products are sold by us."

A clause in the circular stated that Alex. Smith & Co. of Tampico would tell who C. P. Bowers & Co. were, and that they were thoroughly responsible people, and knew about the title, situation, etc. Appended to the circular were many quotations from newspapers and writers concerning the banana growing industry, and paragraphs concerning the advantages of market facilities, and how the investment would bring an income for life. At the close of the circular were some seven "Hints and Paragraphs," such as, "Know your money is invested in an enterprise producing something for which a demand already exists;" "The savings of the average man never bring wealth; profitable investments alone create riches," etc.

There was further testimony from witnesses who stated that after reading the advertisements to the effect that the opportunity offered a chance to make an income for life, and that a half acre for every $100 invested would yield 26 per cent. the first year and 58 per cent. the second and succeeding years on the money invested, they bought some of the land from Bowers. One witness, J. C. Baird, testified that Bowers pointed out to him on a map the location of banana plantations and said that they were selling the land and intended to put a pumping plant on it for irrigation; that he corresponded with C. P. Bowers & Co. and together with his daughter concluded to make an investment; that he received a contract through the mails after remitting $190 in March, 1909. Mr. Baird introduced a letter which he had received from "C. P. Bowers, Pres." on paper headed, "C. P. Bowers & Co., Plantation Owners; C. P. Bowers, President; C. P. Bowers, Vice-President; H. C. Myers, Secretary—Los Angeles, Cal." This letter inclosed contracts made out in the names of J. C. Baird and

Eva Moore, calling for one acre of banana land each. With the testimony of this witness there was introduced a letter addressed to J. C. Baird, signed C. P. Bowers, Pres., written on paper with a caption of the corporation, wherein Bowers wrote him that in answer to his letter of the 15th of May, 1909, they were going to require—

"a little more time than we anticipated in issuing the deeds to yourself and daughter. * * * Things move very slow much slower in Mexico than in the United States, in fact, and especially when you are awaiting upon native officials."

Again, on June 30th, C. P. Bowers, Pres., wrote to Mr. Baird that they were doing everything possible to get the deeds, but that it required 9 months to have a deed delivered and recorded in one instance. The letter advised Mr. Baird that the time of the delivery of the deed did not interfere with the care of his land, and added that:

"The really important part of the entire transaction as we see it, lies in developing the land and producing the crop."

Again, on August 7, 1909, in a letter signed C. P. Bowers, Mr. Baird was advised that he (Bowers) had not yet received the deeds but hoped to have them ready soon, and that both acres of land for which shoots had been planted before Mr. Baird and his daughter purchased would have to be replanted before returns would come, because of a wash and storms, etc. At a later time, on February 2, 1910, Bowers wrote to Mr. Baird that he hoped before long the deeds would be ready for delivery, and again on February 9, 1910, he wrote to Mr. Baird that there was an oil lease on the whole tract of 630 acres, which a large company held, and that the rear of the 630 acres adjoined some land in which there were some strikes of large "gushers." Mr. Baird said that he told Bowers at one time that nearly a year had gone by since he had purchased the property and that the promises for the deed had not been fulfilled; that he had paid cash and wanted his title; that he told Bowers that he had concluded that he could not make a deed to the property because he did not have any title to it; that Bowers remarked that he had some land down there, and when he got the matter fixed up "he thought he could make me a title in the next 60 days."

"Said I, 'Then you virtually admit that you did not own that land at the time you sold it to me?' 'Well,' he says, 'we paid some money on the land and hope to get at least 50 acres;' and I says, 'Mr. Bowers, I am satisfied that you don't own that land, and never did own it and can't give me a title to the property I bought of you. Now, I demand my money back. I demand you to refund to me the money that I paid for this property that you had not title to and couldn't give me a title to.' He says, 'I haven't got any money.'"

Thereafter this witness consulted counsel and made a demand, and received a document about the middle of April, 1914. The document, dated April 14, 1914, is entitled a contract of bargain and sale entered into between C. P. Bowers and J. C. Baird under certain designated conditions. In the first of the conditions Bowers states that he is the sole owner of a certain portion of the property described, which he acquired from Alex. Smith by bargain and sale on July 7, 1910. In the third paragraph the land conveyed from Smith to Bowers is described as 24 hectareas, 2,915 square meters from the southern portion

of said parcel of land, and C. P. Bowers sells, grants, and conveys to J. C. Baird lots 14 and 20 out of block 1, containing one acre more or less, and reserving 3 feet on the east and west boundary, etc. In the ninth paragraph of the contract Bowers declares that the property is free and clear from all incumbrances with the exception of a lease to exploit underground product, the lease having been given in 1901. This deed or contract was mailed to Mr. Baird, together with a letter from Mr. Newton J. Skinner, advising Mr. Baird that he is inclosing a deed for land purchased from Mr. Bowers out of the Bowers Mexican plantation according to the previous contract, and that "it was only within the last few days that Mr. Bowers had succeeded in obtaining a deed to the property and getting it recorded, although the deed was issued to Mr. Bowers about the time of the contract." Witness said that he never had received any profits from the land and that the deed sent him did not call for the land at all; that it was an entirely different piece from that which he had bought, and for that reason he had not accepted the deed and considered it of no value. Alex. Smith testified that he had resided in Tampico, Mexico, since 1900; that he met Bowers in 1907, and that he, Smith, had a deed for the 630 acres concerning which other witnesses had testified; that the final deeds for the property were made to him January 23, 1908, and January 25 and April 7, 1908; that he never had seen anything growing on the land except a little corn; that there were no fruits except wild ones there; that about a year before the trial he had been upon it, and that not more than 40 or 50 acres of the entire tract had been cleared, the clearing being along the river front; that it was grown up in jungle and weeds; that he knew nothing of a pumping plant upon it; that about 1907 he had had a transaction with C. P. Bowers concerning some of the property; that he gave Bowers a letter of option to buy the property at $10 an acre, payments to extend over a period of about a year. The witness explained he had lived in Mexico; that Bowers paid him about $1,500, and in the following year, 1908, he made a new agreement; that before the new agreement was made Bowers asked him to make deeds to various customers to cover some 40 or 50 acres and to convey lands near the river front in the property; that he made some of the conveyances but declined to make others; that he made a new option with Bowers' father; that the second contract called for various payments and contained an obligation whereby Smith should give Bowers a perfect warranty deed when the final payments were made; but that no payments were made on the contract, which expired by limitation, and that witness and Bowers corresponded. Smith said that about July, 1910, he gave Bowers a deed for about 60 acres in the extreme southern end of the property, and a deed for a small portion in the northerly end of the property; that when the contract of option expired he had deeded to Bowers' customers portions of the northerly tract and concluded to deed to Bowers the 60 acres in full settlement; that the deed for the 60 acres settled all relations between them. Witness said that when Bowers wanted deeds for part of the front lands, he refused until the land was paid for and that it generally took two months to get a deed recorded in Mexico.

There was much more evidence tending to support the case of the United States, but with that to which we have referred, and the admission that Bowers did not have a deed to the property which he sold to purchasers, enough has been shown to demonstrate that the case was clearly for submission to the jury under appropriate instructions to the effect that, in order to convict criminally, it was necessary for the government to establish that the defendant entered into the scheme charged, that he intended to defraud those whom he corresponded with, and that for the purpose of executing the scheme he intended to use the mails of the United States.

[3, 4] Error is assigned because the court overruled a special plea and motion to quash the indictment. The point presented is that the count under which Bowers was convicted does not specify that the offense charged was committed within three years prior to the filing of the indictment, January 10, 1913, and that the count is indefinite as to time and the mailing of the letter, and as to the description of the offense. But the scheme charged to have been fraudulent is elaborately set forth, and the defendant is directly charged with having fraudulently and feloniously placed and caused to be placed in the post office at Los Angeles, a letter in an envelope addressed as hereinbefore described. The letter is itself set forth in the second count, and is of date February 19, 1910. In Mitchell v. United States, 196 Fed. 877, 116 C. C. A. 436, it was held by the court that under an indictment for violation of section 5480 of the Revised Statutes as amended by the amendment of March 2, 1889, c. 393, 25 Stat. 873 (U. S. Comp. St. 1901, p. 3696), it was immaterial when the scheme to defraud was devised, but that if the scheme or artifice was devised more than three years prior to the return of the indictment, but was in existence and the defendant was operating under it within three years, the case would be without the statute of limitations and might be prosecuted. We are of opinion, too, that there was sufficient particularity of statement in the indictment to demonstrate that it was for the violation of section 215. Moreover, it was indorsed as an indictment for violation of that section, and the offense described in the instructions of the court was that defined in section 215.

[5] Appellant objected to the testimony of a number of witnesses introduced by the government, on the ground that the events to which they testified transpired more than three years before the filing of the indictment. But under the rule of Mitchell v. United States, supra, the court correctly overruled such objections.

[6] The government, to prove the signature of the defendant, Clarence P. Bowers, offered a witness who said he had seen Bowers write his name to the particular documents offered. The court then admitted such documents with the signature of Bowers as exemplars, and letters bearing signatures C. P. Bowers were thereupon admitted in evidence. To all such evidence the defendant objected, but the objections were overruled and the jury were allowed to make comparison of the letters and documents. This ruling was proper under Act Cong. Feb. 26, 1913, c. 79, which provides that, where the genuineness of the handwriting of a person may be involved, any admitted or proved hand-

writing of such person shall be competent evidence as a basis for comparison by witnesses, or by the jury, court, or officer conducting such proceeding, to prove or disprove such genuineness. Short v. United States, 221 Fed. 248, 137 C. C. A. 104.

[7] It is urged that the court erred in admitting the letter set forth as an overt act charged to have been mailed by the defendant, Bowers, to Hughston. The objection is based upon the ground that the letter does not appear to have been to further the scheme charged to have been devised by the defendant. But if the scheme had theretofore been devised and was fraudulent, and the defendant intentionally and for the purpose of carrying out the scheme wrote the letter described and mailed it within three years prior to the filing of the indictment, it was not necessary that the letter should on its face show that it was in furtherance of the scheme to defraud.

[8, 9] It is argued that defendant was not granted a fair trial because of the misconduct of a juror. Bowers, the defendant, in an affidavit filed in the District Court, set forth that upon one day in the course of the trial at the adjournment of court, and before he and his counsel had left their places in the courtroom, a juror stepped over to the attorney's table, and, leaning over the table, said to him (Bowers): "Are you going to take the witness stand in your own behalf?" Bowers in his affidavit said that he answered that he did not know, and adds that the manner of the juror was such that it made him (Bowers) feel that the juror was speaking for other jurors than himself, and fearing lest if he did not take the stand it would prejudice him in the mind of the juror, he took the stand; that he believed that because of the fact that he did not take the stand, and thus gave the prosecution an opportunity to comment upon the failure of the defense to produce certain evidence, the jury became prejudiced. Several other affidavits in support of Bowers' motion were filed. The juror named by the defendant, Bowers, filed a counter affidavit wherein he positively denies that he ever spoke to Bowers or to his attorney or communicated with either of them in any way whatsoever during the trial, and states that he thoroughly understood his duty as a juror which forbade him to ask any such question as Bowers said he asked him. The matter does not appear to have been brought to the attention of the court before the trial closed, although the defendant had ample opportunity to advise the court of the incident. Defendant is therefore in no position now to claim that his rights were prejudiced. Furthermore, the District Court having considered the matter the appellate court will not disturb the order denying a new trial.

[10] Many errors assigned relate to instructions given and refused. Special stress is put upon the charge of the court with respect to the word "owned," but we think that the meaning given was sufficient. The court said:

"That the word 'owned,' on the fourth page of the indictment together with the clause in which it appears, namely, 'The said C. P. Bowers & Co. owned six hundred and thirty (630) acres of land on the Tamesi river,' etc., implies that the defendant had such an interest in, and dominion over, the property referred to, that they could convey a good and sufficient title thereto, to an intending purchaser."

The court also instructed that if the representations intended to be made as alleged in the indictment were false, but defendants believed them to be true, then said representations would not be fraudulent; but if, however, such representations were false, and defendants knowing their falsity, or not believing them to be true, intended they should be made to deceive and induce the persons to whom they were to be made to send or pay money to the defendants or to C. P. Bowers & Co., then the scheme was one to defraud. This, in connection with the other portions of the charge wherein the court defined the elements of the offense, was correct. And, generally, the whole charge sufficiently set forth the legal principles which controlled.

After painstaking examination of the voluminous record, we fail to find any substantial ground upon which to predicate a reversal of the case, and, as the record discloses that defendant had a fair trial, the judgment must be affirmed.

Affirmed.