**CLARKE et al. v. HOT SPRINGS ELECTRIC LIGHT & POWER CO. et al.***

No. 493.

Circuit Court of Appeals, Tenth Circuit.
Jan. 18, 1932.

Fred R. Wright, of Denver, Colo. (Gail L. Ireland and Clarence L. Ireland, both of Denver, Colo., on the brief), for appellants.

C. R. Latham, of Chicago, Ill., and E. E. Enterline, of Casper, Wyo. (W. T. Alden, of Chicago, Ill., on the brief), for appellees.

Before COTTERAL and PHILLIPS, Circuit Judges, and POLLOCK, District Judge.

*Rehearing denied February 23, 1932.

PHILLIPS, Circuit Judge.

This suit was brought to foreclose a mortgage on the property of the Hot Springs Electric Light & Power Company given to secure a bond issue of $200,000, and for the appointment of a receiver.

The Hot Springs Company was organized in 1907 under the laws of Wyoming for the purpose of operating an electric light plant at Thermopolis, Wyo. In 1908, the entire capital stock was purchased by H. J. Thompson for $30,000. Thompson caused the company to issue bonds of the face value of $30,000. These bonds were not sold, but Thompson occasionally pledged them as collateral security. Shortly after acquiring the plant, Thompson expended $90,000 in the construction of a hydroelectric plant and $10,000 in replacement of old machinery and equipment. In 1919, the stock of the company was sold to Maurice Singer for $145,000. Such bonds were also delivered to him. Immediately after the purchase Singer caused the company to issue bonds of the face value of $200,000, secured by a trust deed on the company's property, including its franchise. From 1923 until it ceased to operate in 1926, the company passed through an adverse experience. In 1923 the hydroelectric plant was destroyed by floods. It was not rebuilt. There were frequent interruptions in service due to worn out equipment. The transmission system was in poor condition, the wires were inadequate to carry the load of current, and the poles were so dilapidated they were continuously being blown down. There was considerable ill feeling toward the company on the part of its patrons and the town council, and numerous complaints were being made because of poor service. Its bond interest for two or three years prior to 1926 remained unpaid, and its taxes were delinquent.

The total cost of property added from the time Singer acquired the company in 1919 to February 1, 1926, and in service on the latter date, was $37,770. This included two Foos gas engines, which cost $14,650, and which were repossessed by the conditional vendor for default in payments.

On November 4, 1925, Paul Rothwell for himself, H. P. Rothwell, and Erwin Rothwell, entered into an agreement to purchase the assets of the company for $165,000 free and clear of all incumbrances. He also agreed to pay Singer $35,000 for disbursements alleged to have been made by Singer for the company. The agreement provided, among other things, that Nathan Haffenberg, president of the company, should obtain all the outstanding bonds, interest coupons, and capital stock for delivery and cancellation, and releases of all the outstanding indebtedness. Several conferences between Paul Rothwell, Singer, and representatives of certain bondholders followed. Ireland attended some of these conferences. The Rothwells were heavily indebted to him, and he gave as his reason for attending the conferences his desire to protect collaterals pledged to him by the Rothwells.

About the middle of December, Ireland received word from A. D. Johnston, his agent at Thermopolis, that the county treasurer was about to sell the personal property and franchise of the company for delinquent taxes. At a conference held in Chicago about December 17, 1925, between Ireland, Paul and Erwin Rothwell, Haffenberg, and Cuff, who represented certain bondholders, Ireland was persuaded to buy the property at tax sale, after being assured that he would be reimbursed by the bondholders. Ireland thereupon directed his agent at Thermopolis to bid in the property.

The agreement of November 4, 1925, was not consummated because appellants had refused to deposit their bonds, and the bondholders did not reimburse Ireland.

Upon returning to Thermopolis on January 29, 1926, Ireland was advised by his attorneys that, unless he took possession of the property, he might lose his lien under the tax sale. He learned that the Foos gas engines had been repossessed by the conditional vendor; that the company was not meeting its current operating expenses; and that its franchise had expired. The officers of the town complained that the company's service had been most unsatisfactory, and solicited him to apply for a franchise and to operate the electric light plant. Thereupon Ireland took possession of the property, applied for a franchise, and incorporated the Monument Hill Electric Company. He transferred to the new corporation the property purchased at tax sale, and made a contract with the Foos Gas Engine Company for the repurchase of the gas engines.

The Monument Hill Company from the time of its incorporation in February, 1926, occupied the premises of the Hot Springs Company. It used the power house until the fall of 1926, when it commenced purchasing power from The Northwest Transmission Company, which had completed a transmission line from Gebo, where the Owl Creek Coal Company, owned by Ireland, operated a coal mine. The Monument Hill Company

built a new distribution system. The old distribution system was abandoned, and the poles were removed by order of the town council. In the summer of 1926, Ireland transferred the stock of the Monument Hill Company to the Northwest Power Company, controlled by the Rothwells, in return for stock of the latter company of the par value of $360,000. The Monument Hill Company's name was then changed to Thermopolis Northwest Electric Company. During the time that Ireland owned the stock of the Monument Hill Company, $80,000 was expended on the plant and system.

The trial court held that the tax sale was void and that Ireland had converted the property, but that a foreclosure of the mortgage would not afford adequate relief. In lieu thereof the court ordered that Ireland and the Thermopolis Company pay into court, for the benefit of appellants and other bondholders of the $200,000 issue, such sum of money as the court upon further hearing should find to be the value of the property and business of the Hot Springs Company, together with such other sums as it should find appellants and the other bondholders were entitled to, less the amount Ireland had paid at the tax sale. The $30,000 bond issue, which had never been sold, was ordered canceled.

After a further hearing the court found the value of the plant of the Hot Springs Company to be $60,000, and the franchise and going concern value to be $20,000. From the aggregate of such values the price paid by Ireland at the tax sale was deducted, leaving $72,000. Interest at the rate of 7 per cent. for four years was then added, making a total of $92,160. Appellants' attorneys were allowed a fee of $10,000 and their expenses out of the fund. Costs were taxed to Ireland and the Thermopolis Company.

The two original plaintiffs, Maurice G. Clarke and Henry T. Clarke, together with John T. Clarke and Ella R. Clarke, have appealed. The two latter appellants filed their claims as bondholders against the fund to be paid into court. Appellants make no objection to the form of relief granted, but complain of the amounts allowed.

The two main questions presented are: (1) Was the amount allowed to the bondholders by the lower court adequate under the circumstances? (2) Should the court have allowed to appellants from the fund recovered certain expenses incurred in connection with this litigation?

Appellants contend that Ireland and the Thermopolis Company should have been required to pay the amount of the purchase price under the contract of November 4, 1925. Ireland was not a party to that contract and was interested therein only indirectly because he was a creditor of the Rothwells. He and the Monument Hill Company, which succeeded him, clearly were not bound by such contract.

Appellants further contend that Ireland is a trustee and is liable to account for any profits he made from the acquisition of such property. At the request of Haffenberg, president of the Hot Springs Company, and Cuff, attorney for the bondholders, he used his own funds to purchase the property at the tax sale in order to keep the property out of the hands of strangers, and to facilitate the carrying out of the agreement of November 4, 1925. The bondholders failed to keep their agreement to reimburse him. He was compelled to take over the property to protect his interests. The tax title was invalid for the reason that no list of delinquent taxes had been certified and filed in the county treasurer's office. Noble v. Amoretti, 11 Wyo. 230, 71 P. 879. If the tax title had been valid, Ireland would not have been guilty of any legal wrong. He became a converter because of the void tax title and he was liable to account for the value of the property as any other purchaser at an illegal tax sale, primarily to the owner of the legal title and secondarily to the bondholders because of their lien.

Appellants are bondholders and as such, in Wyoming, have only a lien upon the property covered by their mortgage. Cone v. Ivinson, 4 Wyo. 203, 33 P. 31, 35 P. 933. Having that status they are entitled to a foreclosure, or, in lieu thereof, to the value of the plant limited by the amount of their lien with interest and costs added. Cone v. Ivinson, supra. The court found that adequate justice could only be arrived at by holding Ireland and the Thermopolis Company liable in damages for the value of the plant as of February 1, 1926, the date of the conversion.

Was the valuation fixed by the lower court fair and equitable?

Thompson testified that he purchased the plant in 1908 for $30,000 and operated it until 1919, when he sold it to Singer for $145,000; that during that time he expended $100,000 on the plant, and that $90,000 of such amount was for the hydroelectric plant, which was destroyed by floods.

Morgan, who was manager of the Hot Springs Company from 1917 on, testified that the total cost of all the property of that company, which was in service on February 1, 1926, amounted to $67,000. He included therein the two Foos gas engines, which cost $14,650, and which were repossessed by the conditional vendor. He further testified that the property purchased and installed between January, 1919, and February, 1926, including the Foos engines, was $37,770, and that some of the proceeds of the $200,000 bond issue was expended for repairs, replacements, or improvements.

There was considerable evidence offered by experts as to the replacement value of the property, the going concern value, and the sale value.

Warren E. Sanborn, an engineer, made a report on the property dealing chiefly with replacement values. He testified on behalf of appellants, but his testimony cannot be given much weight, since he spent only one day inspecting the property, and his figures refer entirely to replacement values.

Frank P. Wood, a witness for appellants, testified that the plant was worth $250,000. Wood made no inspection of the plant and evidently arrived at his conclusion from an examination of the Sanborn report. He stated on cross-examination that the tangible property had very little value except as junk. He stated that a new plant could be installed for $100,000, and that the earnings of the company would be sufficient to pay a reasonable return on $325,000.

Clarence Johnson testified for appellees with respect to the going concern and the sale value of the plant. This testimony was based on a complete investigation of the property made in 1928 for the Chicago Trust Company and another in 1929 for appellees. He testified that a prospective purchaser is concerned principally with the amount of earnings he can expect the property to produce, the length of time that he will receive such returns therefrom, and the amount he will have to expend for additions and betterments in order to enjoy such returns. He further testified that since the rates charged for service were regulated by the Public Service Commission, and that since such rates were based upon a valuation of the physical assets plus a small allowance—usually 15 per cent.—for intangibles, a purchaser could not afford to pay too high a price for the intangibles without taking the chance of having the rate of return on his investment material-ly reduced. He valued the property at $33,-439.

There was considerable evidence to the effect that the plant had very little value; that the relations between the company and the consuming public were strained, and that the town council were dissatisfied with the service and had given a new franchise to Ireland. All of these things had a bearing on the value of the property.

The testimony of the experts is so divergent in nearly all its angles that it is practically impossible to reconcile.

It is worthy to note that in 1919 Thompson sold the property at a private sale for $145,000. The property at that time was in a much better condition than it was on February 1, 1926. At the former date the company's relations with the public, the town council, and the Public Service Commission were considerably better; its equipment was adequate, and its affairs were being run in a business-like manner.

The finding of a chancellor made on conflicting evidence is presumptively correct and will not be set aside unless some serious mistake has been made in the consideration of the evidence. Independent Oil Well Cementing Co. v. Haliburton et al. (C. C. A. 10) 54 F.(2d) 900; Crawford v. Briant (C. C. A. 10) 53 F.(2d) 754; New York Life Ins. Co. v. Griffith (C. C. A. 10) 35 F.(2d) 945; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; Fienup v. Kleinman (C. C. A. 8) 5 F.(2d) 137.

After examining the evidence, we are of the opinion that the value found by the trial court was fair and reasonable.

Appellants contend that the testimony of John T. Clarke relative to the value of the property was erroneously excluded by the court. Clarke did not qualify as an expert. His testimony was nothing more than a personal opinion gathered from conversations with others, observation, and the like, and was rightfully excluded. It is the prevailing rule that the competency of an expert is a preliminary question resting in the discretion of the trial court and its decision, in the absence of a plain error of law, serious mistake of fact, or abuse of discretion, will not be disturbed. Gila Valley R. R. Co. v. Lyon, 203 U. S. 465, 27 S. Ct. 145, 51 L. Ed. 276; Germania Life Ins. Co. v. Ross-Lewin, 24 Colo. 43, 51 P. 488, 65 Am. St. Rep. 215; 22 C. J. 526.

The testimony of Sanborn and Clarke concerning offers made for the property was rightfully excluded. Sharp v. United States, 191 U. S. 341, 24 S. Ct. 114, 48 L. Ed. 211.

The other question remaining is whether the court should have allowed additional expenses to the original plaintiffs. The court allowed expenses for the sums expended during the trial, but considerable sums had been paid out in the preparation of the case, which were not allowed. The additional sum claimed amounts to $3,344.49.

In Trustees v. Greenough, 105 U. S. 527, 532, 26 L. Ed. 1157, the court said: "It is a general principle that a trust estate must bear the expenses of its administration. It is also established by sufficient authority, that where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."

The court should have made an additional allowance to the original plaintiffs to reimburse them for such amounts as they reasonably and necessarily incurred in the preparation of the case, and upon a proper showing is directed to make such allowance and modify the decree accordingly.

The decree in all other respects is affirmed, and the costs will be taxed against appellants.