## TROUTMAN v. UNITED STATES.
### YOUNG v. SAME.
#### Nos. 1671, 1672.

Circuit Court of Appeals, Tenth Circuit.
Dec. 8, 1938.

Rehearing Denied Jan. 9, 1939.

Ralph J. Cummings, Ira L. Quiat, and Julius F. Seeman, all of Denver, Colo., for appellants.

Thomas J. Morrissey, U. S. Atty., and Ivor O. Wingren, Asst. U. S. Atty., both of Denver, Colo.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

The indictment in this case contains 15 counts and covers 45 pages in the printed record. Counts 1 to 13, inclusive, each charge that on or about January, 1934, Percival H. Troutman, Sidney W. Clark, Ralph L. Young, and Lawrence L. Young used the mails in furtherance of a scheme to defraud. These were the major features of the scheme as charged. The Union Trust Company was organized under the laws of Colorado, with authority to receive certain kinds of property for safekeeping and storage, to rent safety deposit boxes, and to act as trustee; The Union Deposit Company was likewise organized under the laws of Colorado, with authority to receive moneys for savings, and to promote and encourage the teachings and practices of thrift and frugality; The Union Deposit and Savings Company was organized under the laws of Delaware, with authority to act as a holding company for the stocks of other companies, and to carry on a general banking and financial business; Union Distributors, Inc., was likewise organized under the laws of Delaware, with authority to do a general brokerage and commission business, and to sell investment trust units sponsored and issued by The Union Deposit Company; the four corporations were known as the "Union Group"; Troutman was the president of each of them; Clark was vice-president and treasurer of The Union Trust Company, The Union Deposit Company, and The Union Deposit and Savings Company, and was treasurer of Union Distributors, Inc.; Troutman and Clark managed and controlled all of such corporations; and Troutman was executor of the estate of Ella A. Troutman, deceased. Bankers National Securities Corporation was a corporation organized under the laws of Colorado, with authority to do a general brokerage business, Ralph L. Young was its president and Lawrence L. Young was secretary and treasurer, and they managed and controlled it. For a long time prior to January, 1934, The Union Deposit Company had engaged in the business of issuing and selling to the public investment trusts called units in various series, each consisting of a participat-

ing share and a trust certificate. The sale price of a unit was $800, payable in a single sum or in equal monthly installments over a period of 12½ months, of which the first $96 was allocated to the purchase in full of the participating share, and $704 was allocated to the purchase of the trust certificate. The $704 was to be invested in authorized corporate securities listed in such certificate and in obligations of the United States, and within thirty days after the maturity of all units in a given series, the trust was to be liquidated and the proceeds distributed in the manner specified. It was further provided in the units that upon ten days notice the owners thereof would have the privilege of withdrawing from time to time any sum of money not to exceed the full amount paid thereon, exclusive of the payments allocated to the participating shares. Troutman and Clark as managing officers in control of the Union Group entered into a scheme with Ralph L. Young and Lawrence L. Young, as managing officers in control of Bankers National Securities Corporation, in which it was agreed that Bankers National Securities Corporation would solicit and persuade owners of units issued by The Union Deposit Company to surrender such units, withdraw the money paid thereon, and with such withdrawals purchase capital stock in Union Distributors, Inc., and investment trust units of series I and K; that for such purpose card lists showing the names and addresses of such owners of units would be furnished the Youngs; and that for the purpose of fraudulently inducing and persuading such persons to make the change certain false and fraudulent statements and representations would be and were made concerning the management, success, and solvency of Union Distributors, Inc., the ownership of the stock being offered for sale, its value, and the circumstances necessitating its sale. Each count charges that in furtherance of such scheme a written communication was sent through the mail. Count 14 charges that the defendants were engaged in the sale of securities, as defined in the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., by the use and means of instruments of transportation and communications in interstate commerce, and by the use of the mails; and that in connection therewith, they employed the device, scheme, and artifice to defraud described in the first count, they obtained money and property from the sale of units by means of untrue statements of material facts and omissions to state material facts necessary in order to render the statements made not misleading, and they engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit upon such owners of units; and count 15 charges that they entered into a conspiracy to form a fraudulent scheme and to use the mails in furtherance of it, and to engage in the business of selling securities in violation of the Securities Act.

The court directed a verdict of not guilty as to Lawrence L. Young, and the jury acquitted Clark. Troutman was found guilty on all counts, except number 11; Ralph H. Young was found guilty on count 15, and acquitted on all others; and they appealed from the respective judgments and sentences imposed upon them.

 It is argued that count 14 is duplicitous in that it charges separate and distinct violations of the Securities Act, 48 Stat. 74, 15 U.S.C.A. § 77a et seq. Section 17 of the act, 15 U.S.C.A. § 77q, provides that it shall be unlawful for any person in the sale of securities by the use of means or instruments of transportation or communications in interstate commerce or by use of the mails (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. The statute thus embraces in the disjunctive three separate and distinct acts as a crime. The indictment charges the three offenses in the language of the statute, but they are charged in the conjunctive. An indictment charging a statutory offense must follow the statute creating it; but where the statute denounces several acts as a crime, they may be charged in one indictment or in a single count if they are connected in the conjunctive. An indictment drawn in that manner is not duplicitous, and it suffices to prove any one or more of the charges. Crain v. United States, 162 U.S. 625, 16 S.Ct. 952, 40 L. Ed. 1097; Ackley v. United States, 8 Cir., 200 F. 217; Simpson v. United States, 9 Cir., 229 F. 940; Dell Aira v. United States, 9 Cir., 10 F.2d 102; Chapman v. United States, 5 Cir., 10 F.2d 124; O'-Neill v. United States, 8 Cir., 19 F.2d 322;

Poffenbarger v. United States, 8 Cir., 20 F. 2d 42; Collins v. United States, 8 Cir., 20 F. 2d 574; Wolpa v. United States, 8 Cir., 86 F.2d 35.

It is further contended that count 15 is duplicitous for the reason that it charges a conspiracy to commit two separate offenses, the first being to violate the statute forbidding the use of the mails in furtherance of a scheme or artifice to defraud, and the second being to violate the Securities Act. The essence of the crime of conspiracy is two or more persons combining with the intent and purpose of committing a public offense by doing an unlawful act or doing a lawful act in an unlawful manner. It is a distinct offense from that which the parties intend to accomplish as the result of the conspiracy, and it is complete when the agreement has been formed and one or more overt acts have been done in furtherance of such unlawful design. And a single conspiracy may have for its object and purpose the violation of two or more criminal laws. To illustrate it would be one offense for two or more persons to enter a post office and kill the postmaster or other person having custody of the public moneys, and it would be another to rob the office of such moneys. But a single conspiracy may have both for its object and purpose. And an indictment charging a single conspiracy to violate two or more separate criminal statutes is not vulnerable for duplicity. United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211; Frohwerk v. United States, 249 U. S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Anderson v. United States, 8 Cir., 273 F. 20; Taylor v. United States, 7 Cir., 2 F.2d 444; Bailey v. United States, 5 Cir., 5 F.2d 437; Perry v. United States, 5 Cir., 39 F.2d 52; Dowdy v. United States, 4 Cir., 46 F.2d 417; Blum v. United States, 6 Cir., 46 F. 2d 850; Center v. United States, 4 Cir., 96 F.2d 127.

The action of the court in admitting the testimony of the witness Hollister, in admitting certain correspondence in connection with such testimony, and in admitting the testimony of the witness Kuempel is challenged. Hollister was trust officer of Metropolitan Trust Company of Los Angeles, California. That company acted as trustee for investment trusts series C and E, issued by The Union Deposit Company in 1930 and 1931, respectively. Stated in outline, the witness testified that in 1932 and again in 1934 The Union Deposit Company failed to forward to the trustee for safekeeping moneys collected from investors or corporate securities purchased with such moneys as it was required to do by the terms of the trust agreements; that letter and telegraphic correspondence passed in relation to such defaults and methods of correcting them; that so-called withdrawal receipts were submitted with direction to cure the defaults by application of the money thus withdrawn; that notices of default were given; that in February, 1933, a check for $2,436.-03 was forwarded to cover the first default, but payment upon it was stopped and it was never paid; that the entire matter was settled in the summer of 1933; that the second default was never cured; and that the two series of trust investments were liquidated through a judicial proceeding in Colorado. The two trust agreements and the correspondence, properly identified by the witness, were admitted in evidence. The witness Kuempel testified that he was an accountant, and that the books of Union Distributors, Inc., exhibited in the court, disclosed that the collections from purchasers of units during the months of January, February, and March, 1933, exceeded $13,000, and that the money was not remitted to the trustee but was put into the general account of the corporation and used for current expenses. The argument is that the evidence bore no relation to the offenses charged; that at most it tended to prove embezzlement, or fraud upon Metropolitan Trust Company which was a different offense from those charged in the indictment; and that it was prejudicial.

Intent is an element of the crimes charged in the indictment. It must be alleged and proved. One of the acts charged here was that the defendants would and did falsely and fraudulently represent to owners of units that the defendants who had managed and controlled The Union Deposit Company had complied with the terms and requirements of the trust indentures; that they had regularly reported to the trustees the moneys collected; and that they had faithfully deposited with such trustees the moneys and securities as required. The evidence in question was relevant and material upon the question whether a scheme was devised with the fraudulent intent and purpose to sell capital stock of little or no value at a greatly inflated or fabricated price for the purpose of relieving the straightened financial

condition of the Union Group. It was clearly admissible for the purpose of shedding light upon the good faith or bad faith with which the plan to sell the stock was formed. C/f Coulston v. United States, 10 Cir., 51 F.2d 178; Butler v. United States, 10 Cir., 53 F.2d 800.

And the fact that the first default occurred and much of the correspondence passed before the date on which it is alleged that the scheme was formed did not render the evidence inadmissible. When not too remote or unconnected with the alleged scheme as to cast light upon the question of intent, evidence tending to prove relevant acts or conduct which occurred before the date on which it is charged the scheme was devised, or more than three years before the return of the indictment, may be admitted if within the period of limitations the mails were used in furtherance of such scheme. Bowers v. United States, 9 Cir., 244 F. 641; Hatem v. United States, 4 Cir., 42 F.2d 40. C/f Little v. United States, 10 Cir., 73 F.2d 861, 96 A.L.R. 889. Neither did the fact that the evidence may have tended to establish the crime of embezzlement or that of defrauding the Metropolitan Trust Company warrant its exclusion where it was relevant to an issue in the case. An accused cannot be convicted upon evidence that he committed another crime, and ordinarily evidence of a crime wholly separate and independent and with no relation to the one charged in the indictment is not admissible, but relevant evidence which tends to prove a material fact in the case on trial should be admitted even though it tends to show that the accused committed another offense at a different time and place. Suhay v. United States, 10 Cir., 95 F.2d 890, certiorari denied 304 U.S. 580, 58 S.Ct. 1060, 82 L.Ed. 1543.

The point is made that the court should have instructed the jury in respect to the testimony of the witness Knauff. The witness testified that he had been a public accountant since 1918; that he had been an accountant-investigator for the United States Securities and Exchange Commission since 1934; that he examined the books and accounts of The Union Deposit Company; and that it required about four months to do so. He further testified in detail that he reduced the value of certain assets without making a personal examination of them; that he eliminated certain notes receivable without making an investigation of the persons who owed them; that several of such notes were subsequently paid; that after such adjustments had been made it was his opinion that the corporation was insolvent on December 31, 1933; and that certain shares of capital stock of Union Distributors, Inc., cost The Union Deposit Company only $4.96 per share. He admitted that he made a mistake of less than $5,000. As we understand the contention, it is that the jury should have been instructed concerning the qualifications of the witness to testify as an expert and the weight to be given to his testimony. The question of the qualifications of a witness to testify as an expert rests largely in the sound discretion of the trial court, and the exercise of that discretion will not be lightly disturbed on appeal. A clear showing of abuse of discretion is required. Chateaugay Ore & Iron Co. v. Blake, 144 U.S. 476, 12 S.Ct. 731, 36 L.Ed. 510; Gila Valley R. R. Co. v. Lyon, 203 U.S. 465, 27 S.Ct. 145, 51 L. Ed. 276; Clarke v. Hot Springs Electric Light & Power Co., 10 Cir., 55 F.2d 612; General Paint Corporation v. Kramer, 10 Cir., 68 F.2d 40; American Glycerin Co. v. Eason Oil Co., 10 Cir., 98 F.2d 479. Nothing appears in the record from which it can fairly be said that the court abused its discretion in permitting the witness to testify as an expert or that the testimony necessarily called for a special cautionary instruction in respect to the weight to be given it.

In the course of overruling an objection to a question propounded to a witness for the Government, the court stated that it would be necessary to connect each defendant with the case but that it would have to be done in proper order, and that the objection might be renewed later if the defendants were not connected "with this unlawful scheme or schemes". And in the course of the instructions to the jury the court referred in three instances to the persons charged to have been defrauded as "victims". It is urged that these statements and references were prejudicial. It is plain that in using the language "with this scheme or schemes" the court merely referred to the scheme charged in the indictment, and did not indicate or intimate that in its opinion the evidence adduced disclosed the existence of such a scheme or the guilt of the defendants. It is equally plain, that in characterizing the persons charged to have been defrauded as victims,

the court merely referred to them as those whom the Government contended had been victimized, without indicating or intimating that in its opinion they were shown to be victims. But no objection or exception was made or taken to either statement or reference, and the matter now urged was not called to the attention of the trial court in any manner. It has been repeatedly held that ordinarily alleged errors taking place during the trial of a criminal case must be called to the attention of the court and thus afford an opportunity to correct them. It was essential to the review of these questions that they be presented to the trial court in some manner. Strader v. United States, 10 Cir., 72 F.2d 589; Edgmon v. United States, 10 Cir., 87 F.2d 13. Where life or liberty is involved, an appellate court may notice and correct a serious error which was plainly prejudicial without it being called to the attention of the trial court, and even though it is not presented by assignment of error. Bogileno v. United States, 10 Cir., 38 F.2d 584; Addis v. United States, 10 Cir., 62 F.2d 329; Trefone v. United States, 10 Cir., 67 F.2d 954; Hoffman v. United States, 10 Cir., 68 F.2d 101; Strader v. United States, supra; Kelly v. United States, 10 Cir., 76 F. 2d 847; Edgmon v. United States, supra. But these statements and references cannot be regarded as such errors.

It is also contended that the court erroneously failed at various times during the trial to limit certain evidence to one defendant and failed to instruct the jury that it should not be considered as to others. The court stated at one juncture in the trial that the jury were to judge all the evidence; that it was for them to segregate that which applied to one or more defendants; that they should make that distinction; that they would keep that trust in mind throughout the evidence; and that they must be careful to keep in mind the respective defendants and the evidence, if any, in respect to each of them. In addition, the court gave this formal instruction: "Considerable of this testimony goes only to the guilt or innocence of one particular or two defendants. Some of it goes to the guilt of them all, or their innocence. You will recall that in the course of the trial the Court instructed at various stages that certain evidence applied only to one defendant, and must be disregarded as not to count or prejudice you against the other defendants. It is necessary in your calm consideration of this evidence to segregate it among the various counts and various charges that are made here in the indictment, and also as to whether or not it affects one or more of the defendants, and, if so, which one."

The purpose for which evidence is admitted or the party to whom it applies may be limited either at the time it is received or in the general instructions. McAllister v. McAllister, 72 Colo. 28, 209 P. 788; Courter v. Chase & Son Mercantile Co., 222 Mo.App. 43, 299 S.W. 622. Where two or more defendants charged with a crime are tried jointly evidence which is competent against either should be admitted, and it then becomes the duty of those desiring that it be limited to submit a proper instruction covering the subject. No instruction was tendered here in which any evidence was specified and the jury charged that it had relation to a particular defendant and could not be considered against others. In the absence of such a requested instruction there is no basis for complaint. Ball v. United States, 9 Cir., 147 F. 32; Schultz v. United States, 8 Cir., 200 F. 234; Moffatt v. United States, 8 Cir., 232 F. 522; People v. Haydon, 18 Cal.App. 543, 123 P. 1102, 1114; Quinn v. Van Raalte, 276 Mo. 71, 205 S.W. 59; Dendinger v. Martin, Tex.Civ.App., 221 S.W. 1095; Lanham v. Vesper-Buick Automobile Co., Mo.App., 21 S.W.2d 890.

Exceptions were directed to the instructions, and to the failure of the court to instruct upon certain questions; and the court refused to give six requested instructions. It is enough to say in respect of the instructions given that in our opinion they were reasonably complete and accurate. They covered in a fair manner the issues which the charge and the proof presented; they safeguarded the rights of appellants; and the jury must have understood the law applicable to the questions for their determination. Treating the requested instructions as correct in substance, it was not error to refuse them for the reason that the questions to which they related were covered in the instructions of the court. A court is not required to give a requested instruction if the matter has already been covered in the instruction given. Tingley v. United States, 10 Cir., 34 F.2d 1; Luke v. United States, 5 Cir., 84 F.2d 823; Brett v. United States, 9 Cir., 86 F.2d 305; Bowater v. Worley, 10 Cir., 57 F.2d 970; Detroit Fire & Marine Ins. Co. v. Oklahoma Terminal Elevator Co.,

10 Cir., 64 F.2d 671; George v. Wiseman, 10 Cir., 98 F.2d 923.

 The remaining question is whether the court should have directed a verdict of not guilty and whether there was substantial evidence to support the verdict. There was evidence which the jury manifestly believed and which warranted them in finding these facts. Acting through the Union Group, Troutman engaged since 1929 in the business of issuing and selling investment units of different series consisting of a participating share and a trust certificate. The price of units up to series F was $800, and the price of those in subsequent series was $1000, payable in a single sum or in equal monthly installments. The certificates required that the money paid, except the small part allocated to purchase in full the participating shares, be deposited with a trustee for safekeeping or that it be invested in listed securities and the securities deposited with the trustee for safekeeping; and they further provided that on notice given the money paid upon the trust certificates could be withdrawn. A trust company in Los Angeles, California, acted as trustee for some series, and a corporation in Philadelphia, Pennsylvania, acted as trustee for others. Units were sold in seven or eight states and the organization included two or three hundred salesmen who were employed on a contingent basis. The enterprise was a financial success until sometime in the year 1932, at which time it met with reverses. Salesmen sought employment elsewhere and the organization became demoralized. Two separate defaults were made in transferring money to the trustee in California. Devious methods were employed in an effort to correct them. Payment was stopped on a check which had been mailed to the trustee for money due; and the money was withdrawn from the bank and used for operating expenses. More than thirteen thousand dollars which should have been forwarded to the trustee for the first three months in 1933 was never remitted, but used for other purposes. The first default was corrected otherwise than by payment of the money received from the purchasers of units; the second default was never corrected; and the series there involved were liquidated through a judicial proceeding in Colorado. After July, 1933, The Union Deposit Company deposited in its general account money collected from the owners of units, and then issued checks and held them in the office until there was sufficient money in the bank to pay them. With that distressed condition at hand, Troutman purporting to act as executor of the estate of his deceased mother, and Bankers National Securities Corporation, dominated and controlled by the Youngs, executed a contract dated April 3, 1934, in which it was provided that the Securities Corporation should undertake the sale to owners of units of the remainder of the capital stock of Union Distributors, Inc., which the estate owned. The stock was to be sold at $250 per share; and the plan was to persuade such owners to surrender their units, withdraw the money paid on them, and purchase the stock as well as units in a subsequent series. Troutman was to and did furnish the Youngs with cards showing the names and addresses of such owners of units. Further purporting to act as executor, Troutman wrote letters to various owners of units stating that in making preparation to close the estate he was offering for sale through his brokers a few hundred shares of such stock; that instead of offering it to the public he had stipulated that it be first offered to clients of the Union Group; that the persons addressed had shown their loyalty and confidence in his companies; that such stock would provide a wider participation in the earnings of the Union Group than would the units; that a representative of the brokers would call soon for the purpose of explaining how one or more shares of stock could be purchased; and that he hoped careful consideration would be given to what the representative had to say. The statement was made in the first series of letters that the estate owned the stock, while it was stated in some subsequent correspondence that it was held as a pledge. Young had been employed by the Union Group as a salesman from 1927 to 1931. He was in the office and talked with Troutman on various occasions about the time the contract was executed; and he called on long distance telephone the national sales director and urged that his consent be given to the proposed canvass of owners of units in California. He went to California with five or six other salesmen, and a stock-selling campaign was launched. Owners were interviewed and urged to make the change. Young interviewed some of them. Many surrendered their units and acquired stock. It was acquired at $250 per share, and was of little value. Young testified that he did not have any knowledge concerning the value of the

636

stock, but admitted that he failed to make any inquiry. The inventory of the estate failed to list or make reference to any stock of Union Distributors, Inc.; and there was no order in the files of the county court having jurisdiction of the estate authorizing the executor to sell any such stock. The books of Union Distributors, Inc., likewise failed to show that the estate owned any of the stock. They showed that the stock out of which the sales were made to the owners of units stood in the name of The Union Trust Company. And the records of The Union Trust Company showed that it owned such stock; that it was set-up on the books at a liquidating value of $26.872 per share; and the reports which The Union Trust Company made to the Bank Commissioner of Colorado, as of February 25, and June 30, 1935, respectively, over the signature of Troutman, failed to state or indicate that the stock had been pledged. Other facts were established, but this sketchy review is enough. The evidence with its reasonable inferences and deductions required the submission of the case to the jury and sustains the verdict.

The judgments are severally affirmed.